447 So.2d 968 (1984)
WILLIAMS ROOFING, INC. and Chubb Pacific Indemnity Insurance Company, Appellants,
v.
Donald MOORE, Appellee.
No. AU-36.
District Court of Appeal of Florida, First District.
March 16, 1984.
*970 Bernard J. Zimmerman, and Marshall S. Adler, of Akerman, Senterfitt & Eidson, Orlando, for appellants.
O. John Alpizar, of Law Offices of O. John Alpizar, P.A., Palm Bay, for appellee.
SHIVERS, Judge.
In this workers' compensation case, the employer/carrier appeals an order of the deputy commissioner which, inter alia, awards wage loss benefits. Appellants argue that the deputy commissioner erred in awarding wage loss benefits because the loss of wages suffered by the claimant was not causally related to the industrial accident and because the claimant did not conduct an adequate work search. We disagree and affirm.
On October 29, 1979, Moore was working for Williams Roofing and sustained a compensable accident when he stumbled with a bucket of hot tar. The tar spilled on him, and some of it poured down into the glove on his right hand, badly burning that hand. Claimant was treated by Dr. Remark, a plastic surgeon, who performed several surgical procedures including extensive skin grafts on the right hand. Eventually, the fifth finger of the right hand was amputated. Despite the extensive plastic surgery, claimant's right hand remained in a disfigured condition. The deputy commissioner states in the order sub judice:
In addition to the amputation in this instance and the obvious organic damage to the nervous system which occurs part and parcel to that amputation, I feel compelled as part of this Order to comment on the grotesque and catastrophic appearance of claimant's right hand as he sat before me at this hearing. I begin by stating that this is perhaps the worst hand injury short of total amputation that I may have witnessed in all the years I have been hearing Workers' Compensation cases. To say that this young man's hand resembles a "claw" would not be enough. To say that he would be better off with a claw instead of what he has left may be more accurate. Besides the permanent loss of a finger because of the amputation, claimant has very little functional use of the remaining fingers of the right hand. The remaining fingers are bent, mangled and badly scarred. They are, for all practical reasons, totally useless to the claimant. The upper portion of the hand and the palm itself are badly scarred. The knuckles of the fingers and the joints themselves border on being totally exposed and the skin and surrounding tissue appears extremely thin.
At most, claimant is able to touch his thumb and index finger of the right hand in a pincher type maneuver. Otherwise, the hand appears totally useless. Claimant is also severely scarred about the right forearm and right elbow. There are some small scars on the left hand and arm which are not quite as significant. However, I cannot stress enough the catastrophic appearance of this man's hand, even as he sat before me almost two and one-half (2 1/2) years post-accident.
Claimant was not released to go back to work until September 17, 1980. He reached maximum medical improvement December 17, 1980. Dr. Hicks, a plastic surgeon and associate of Dr. Remark, gave claimant a permanent impairment rating of 56% for the right hand under the AMA Guides. Upon being released to work in September 1980, claimant attempted to return to Williams Roofing, his pre-accident employer, but was not given a job. Claimant *971 testified that he then looked for work at construction sites and found a job with Tom Davis Construction Co. Claimant was able to do the labor required by making certain adjustments, for example, he picked up cement blocks by running his hand through the block and resting the block on his forearm. Claimant worked at this job from September 1980 until January 1981, when he was fired because of excessive absenteeism. Claimant testified that he sometimes missed work during cold weather because the cold created a burning sensation in his hand. Claimant's hand is extremely sensitive to cold and even room air conditioning can cause discoloration in the hand. After being fired by Tom Davis Construction Co., claimant checked the classified sections of newspapers, went to the State Employment Office almost every day, and went to a number of potential employers looking for work. In May 1981, claimant found a job with Cox Electric and worked there until December 1981, when he was laid off. Claimant again looked for work through the newspaper, the State Employment Office, and through friends and relatives. One month later, in January 1982, he found a job with Ace Auto Electric.
On February 27, 1982, claimant was running a lathe for Ace Auto Electric when his right thumb was caught by the machine and broken. Claimant suffered a compound fracture which was treated by Dr. Risi, an orthopedic surgeon. Claimant was off work five weeks following this injury. Dr. Risi rated claimant with a 36% permanent disability of the thumb under the AMA Guides. Because of claimant's preexisting problems with this hand, Dr. Risi could not make a determination of how much of claimant's permanent impairment was due to the second industrial accident. The deputy commissioner compared Dr. Risi's findings with the previous findings of Dr. Hicks following claimant's first accident (considering only range of motion figures) and stated that claimant appears to have a 16% greater impairment of the right thumb following his second industrial accident. Claimant testified that after the second accident he had a problem working with small bolts, which problem he did not have after the first accident. There was no evidence, however, that the relatively minor additional impairment resulting from the second accident had any significant effect on claimant's work. Claimant returned to work for Ace Auto Electric until he was laid off in May 1982. Claimant again looked for work with a number of potential employers and found a job with Southland Electric in July 1982. He worked there until he was fired in October 1982. Claimant again read the classifieds and checked with the State Employment Office. He looked for various jobs with the City of Melbourne and the City of West Melbourne, checking with the City of West Melbourne every week. In March 1983, he found a job doing lawn care, working 48 hours a week.
Claimant contended entitlement to various benefits from both the employer/carrier here and from Ace Auto Electric and its carrier. After a hearing on this claim, the deputy commissioner found, inter alia, that claimant's wage loss was due to the first accident and not to the second accident. The deputy commissioner awarded wage loss benefits from December 17, 1980, through February 26, 1982, and from May 14, 1982, to the date of the hearing.
Appellants argue that there was no causal connection between claimant's loss of wages and his industrial accident of October 29, 1979. Appellants maintain that the causal connection was broken by the fact that claimant was able to return to work for various employers until he was laid off for economic reasons unrelated to his industrial accident. Appellants cite this court's decision in Citrus Central v. Parker, 423 So.2d 610 (Fla. 1st DCA 1982), to support this position. By this argument appellants attempt to stretch the holding of Parker out of all proportion to the rationale of that case. Factually, the two cases are almost totally dissimilar. In Parker, the claimant's disability and limitations were relatively minor. Parker returned to the same job with the same employer as *972 before his industrial accident. Upon his return, Parker received a greater rate of pay than he had before he was injured. Parker was eventually laid off, and it was clear that this layoff was due solely to economic conditions and had nothing whatsoever to do with the industrial accident, Parker's impairment, or his resulting limitations. Parker found another job which he considered superior to his previous employment. Much of his reasoning for considering the new job superior was unrelated to his injury or limitations. Parker refused to return to his former job even when Citrus Central offered it to him. In short, there was an absence of evidence in Parker from which it could be concluded that Parker's wage loss was causally related to his industrial injury. The only analogy between Parker and the instant case is that both claimants, at one-time or another, were laid off for economic reasons. In the instant case, claimant has suffered a serious impairment with obvious limitations. Moore's former employer, Williams Roofing, would not take him back even though he requested to come back. Additionally, there is evidence in the record that claimant suffered from chronic absenteeism during cold weather due to problems with his hand and that this absenteeism contributed to claimant's firings and layoffs. In relation to his various employments, claimant testified that he was the last hired and the first fired. These facts are more than sufficient to establish a causal connection between the industrial injury and claimant's subsequent wage loss.
As pointed out by Chief Judge Ervin in his special concurrence in D.L. Amici Co. v. Jackson, 444 So.2d 978 (Fla. 1st DCA 1983), this court's decision in Parker contains a potential for abuse. Parker does not stand for the proposition that being laid off from employment for economic reasons negates a causal connection between the industrial injury and any subsequent wage loss. Nor does Parker stand for the proposition that a claimant can never prove a causal relationship if he returns to his pre-accident job at the same or greater pay but subsequently suffers a wage loss. Parker merely stands for the proposition that a claimant must produce competent substantial evidence from which there can be inferred a causal relationship between the industrial injury and any subsequent wage loss, and that evidence of being laid off for economic reasons unrelated to the injury, without more, is insufficient to establish this causal relationship. Parker stands for this proposition and no more.
In Regency Inn v. Johnson, 422 So.2d 870 (Fla. 1st DCA 1982), rev. denied, 431 So.2d 989 (Fla. 1983), this court interpreted section 440.15(3)(b)2., Florida Statutes (1979), and stated:
We think a more plausible and reasonable interpretation of the burden of proof provision is found by relating it to the requirement of showing a causal relation between the injury and a change in employment status, and to the specific qualifications and limitations on wage loss entitlement mentioned in the statute. That is to say, the burden of proof provision is to require the employee to go forward with evidence showing a change in employment status due to the injury, and an adequate and good faith attempt to secure employment commensurate with his abilities so as to establish, prima facie, an economic loss and to show that he or she has not voluntarily limited his or her income or failed to accept employment commensurate with his or her abilities.
Id. at 876. Whether a claimant has shown a causal relationship between the injury and a change in employment status is a factual question to be determined by the deputy commissioner from competent substantial evidence. The presence or absence of any particular fact, such as a layoff due to economic conditions, should not be legally determinative of the deputy commissioner's finding. Rather, the deputy commissioner must look to the totality of the circumstances to determine whether a claimant has shown a causal relationship between the injury and the wage loss. One *973 can easily imagine, for example, a claimant who, although admittedly laid off due to economic conditions, can produce evidence from which it can be inferred that his subsequent failure to be employed is causally related to the industrial accident. Nor would the fact that a claimant was fired from employment obtained subsequent to his injury prevent that claimant from showing the requisite causal relationship. See Lasher Milling Co. v. Brown, 427 So.2d 1034 (Fla. 1st DCA 1983). Also, as Chief Judge Ervin pointed out in his special concurrence in D.L. Amici v. Jackson, supra, a deputy commissioner is not bound to accept evidence of non-injury related motivation presented by an employer/carrier concerning an employee's change in employment status if there is evidence which suggests that the industrial injury played some part in the decision or sequence of events.[1] Indeed, so many factual situations can be imagined in which the holding of Parker would be inapplicable that to attempt a list would serve no useful purpose. No doubt, factual situations even beyond imagination could arise. Because of this, and because of the great potential for misinterpretation and abuse latent in Parker and its progeny,[2] we think that Parker and the cases following it should be strictly construed and limited to their facts.
Appellants' contention that claimant's subsequent industrial accident prevented any wage loss after that accident from being causally related to the first industrial accident is also without merit. The deputy commissioner's finding that the wage loss was not due to the second injury or accident is supported by competent substantial evidence. Appellants' argument that a reduction in wage loss benefits is required by section 440.15(5)(d), Florida Statutes (1979), misinterprets that statutory section. That section states:
If an employee receiving wage-loss benefits suffers a subsequent injury causing an additional compensable wage loss, benefits for each wage loss shall be payable; however, the total wage-loss benefits payable shall not exceed the maximum compensation rate in effect for permanent disability at the time of the subsequent injury. Any reduction in wage-loss benefits due to such limitation shall be applied first to the benefits payable as a result of the prior injury.
This section mandates a reduction in wage loss benefits payable as a result of the prior injury only where the total wage loss benefits payable from both injuries would exceed the maximum compensation rate in effect for permanent disability at the time of the subsequent injury. The statute does not mandate a reduction in wage loss benefits payable as a result of the prior injury merely because a subsequent injury exists. Further, the section only applies where the subsequent injury causes an additional compensable wage loss. Here, the deputy commissioner found that no compensable wage loss was due to the subsequent injury.
Appellants ask this court to reweigh the evidence by contending that claimant's work search in the instant case was not adequate. This contention is frivolous. The record contains ample competent evidence to support the deputy commissioner's finding. Further, this claimant, with a blatant physical limitation, was extraordinarily successful in actually obtaining employment. Although it is true, as appellants argue, that this claimant often looked for work in places where he had previously been turned down, it is difficult to understand why claimant should be criticized for utilizing an apparently successful technique.
*974 Accordingly, the order sub judice is AFFIRMED.
JOANOS and THOMPSON, JJ., concur.
NOTES
[1] Cf. City of Tampa v. Fein, 438 So.2d 442 (Fla. 1st DCA 1983) (argument that Fein voluntarily discontinued his employment for reasons unrelated to his compensable accidents resolved against City by deputy commissioner's findings).
[2] See Certified Grocers v. Opel, 430 So.2d 953 (Fla. 1st DCA 1983); Photo Electronics Corp./WPEC v. Glick, 432 So.2d 164 (Fla. 1st DCA 1983); Golden Gem Growers, Inc. v. Crow, 434 So.2d 41 (Fla. 1st DCA 1983); D.L. Amici Co. v. Jackson, 444 So.2d 978 (Fla. 1st DCA 1983).