507 So.2d 138 (1987)
Lucien COQ, Appellant,
v.
FUCHS BAKING COMPANY and GAB Business Services, Appellees.
No. BM-91.
District Court of Appeal of Florida, First District.
May 5, 1987.
*139 Mark L. Zientz of Williams & Zientz, Coral Gables, for appellant.
Jeffrey C. Fox of Ress, Gomez, Rosenberg, Howland & Mintz, North Miami, for appellees.
ERVIN, Judge.
Appellant/claimant appeals an order of the deputy commissioner denying workers' compensation benefits. Appellant raises the following issues on appeal: First, that the deputy erred in concluding that there was no objective evidence that appellant's asthma was caused by exposure to the work place, and in applying the American Medical Association (AMA) Guidelines, by which he found claimant suffered no permanent impairment (PI); second, that the deputy made inconsistent findings regarding the date of the accident and the date of maximum medical improvement (MMI); and third, that he erred in denying wage loss (WL) benefits, by finding that claimant had conducted an inadequate work search. We reverse as to all three issues.
Appellant was employed at a commercial bakery in Miami for approximately six years. While there he began to suffer from acute asthma attacks, culminating in an attack occurring on October 1, 1984, requiring that he be rushed to the emergency *140 room of Jackson Memorial Hospital, where he was hospitalized. After testing demonstrated that claimant suffered an allergic reaction to aerosolized flour, he was advised by his doctor to no longer work at the bakery. The claimant subsequently found employment as a busboy at a far less average weekly wage than that paid him as a baker. The employer/servicing agent (e/sa) paid medical expenses resulting from the incident and paid temporary total disability (TTD) payments from the date of the October incident until January 2, 1985. The subsequent claim for workers' compensation benefits requested TTD or temporary partial disability payments (TPD), payment of medical bills and future medical care and WL benefits, or permanent total disability (PTD) from the date of MMI. After a hearing, the deputy issued an order concluding that the claimant did not suffer from a permanent impairment due to his exposure to flour dust, or that he failed to make an adequate work search, and was therefore not entitled to any compensation benefits.
There is no competent, substantial evidence to support the finding of the deputy that "no objective medical evidence was presented to establish that the claimant's asthma was caused by exposure to flour." In so concluding, we agree with the e/sa that the pre-trial stipulation accepting a date of injury, and the existence of a compensable accident made the issue of whether the claimant had suffered an accident moot by the time of the final hearing. The focus of our inquiry is whether the finding of no PI is a misapplication of the law.
In deciding that the claimant suffered no PI as a result of his exposure to flour in the work place, the deputy relied on the testimony of Dr. Kahn who opined that under the AMA Guidelines, the claimant had suffered no impairment. Although the deputy generally has the discretion to accept the expert testimony of one witness, Dr. Kahn, over that of another, Dr. Klimas, regarding PI, the deputy erred in applying the AMA Guidelines to the appellant, in that the Guidelines simply do not cover appellant's condition  an allergic reaction to the work place that prevents him from functioning in his chosen occupation. We have frequently stated that if PI cannot be reasonably determined using the AMA Guidelines, other "generally accepted medical criteria" can be used to determine PI. Trindade v. Abbey Road Beef 'N Booze, 443 So.2d 1007, 1012 (Fla. 1st DCA 1983). Accord Martin County School Board v. McDaniel 465 So.2d 1235, 1240 (Fla. 1st DCA 1984) (on rehearing en banc), appeal dismissed, 478 So.2d 54 (Fla. 1985); United General Construction v. Cason, 479 So.2d 833 (Fla. 1st DCA 1985). The AMA Guidelines were inapplicable to claimant's asthmatic condition because the Guidelines establish PI for a respiratory condition only if one suffers from dyspnea (difficulty in breathing), or impaired ventilatory function (reduced lung capacity). American Medical Association, Guides to the Evaluation of Permanent Impairment at 86 (2d Ed. 1984). Since Dr. Kahn found that the claimant had no dyspnea, and possessed normal pulmonary function, claimant was determined by Dr. Kahn to have no PI under the Guidelines.[1]
We regard the instant case as similar to Dayron Corporation & Claims Center v. Morehead, 480 So.2d 235 (Fla. 1st DCA 1985), where we sustained a finding that a machinist was permanently impaired, observing that he would be 100-percent impaired if he worked with a new cutting oil, but would suffer no impairment if he avoided the oil. See also OBS Co. v. Freeney, 475 So.2d 947 (Fla. 1st DCA 1985).
In the case at bar all of the medical evidence, including the testimony of the two physicians, discloses that the claimant is suffering from Baker's Asthma, triggered by his exposure to aerosol flour, and that he will suffer severe asthmatic attacks or risk death if he continues to work with *141 or around flour. The evidence reveals moreover that claimant will continue to suffer from asthma and will require chronic medication even if he is never again exposed to flour dust. In that the AMA Guidelines do not take into account the economic loss resulting from a condition such as Baker's asthma, the Guides do not apply. "[T]he Guides are not exclusively controlling because the Guides do not address claimant's evident economic loss, which is the basis of the wage-loss concept." Id. at 951. In that Dr. Kahn's testimony relied upon the Guides, his testimony of no PI had no relevant value. The only competent evidence regarding PI in the record is the expert opinion by Dr. Klimas that the claimant is ten percent permanently impaired.[2] The claimant has established PI.
The deputy made an alternative finding that even if claimant suffered a PI, he sustained no WL because he failed to conduct a satisfactory work search. We conclude this finding is also in error on the grounds, first, the claimant was not adequately informed of his rights and responsibilities under the Workers' Compensation Act, and second, the claimant, by finding and holding a job, performed the equivalent of a work search.
An employee is excused from a job search if the employer fails to inform the employee of his rights and responsibilities under the Act. See Morris v. Metal Industries, 491 So.2d 312 (Fla. 1st DCA 1986) (claimant excused from job search, even though advised by own counsel to perform a search); Defrees v. Colt and Dumont/Hit Sales, 483 So.2d 848 (Fla. 1st DCA 1986) (claimant excused from job search when a form letter from the employer made no mention of the requirement under Chapter 440 for a documented work search). The claimant at bar stated without contradiction that he was never provided with any WL forms by the e/sa. In that the record establishes that the claimant was not informed of his responsibility to conduct a work search, the case law is clear that he is excused from conducting a work search. While we are aware that the claimant's physician had advised claimant to seek employment, we are nonetheless guided by the principle that the worker's compensation process is an employer/carrier-monitored system, not a doctor-monitored system. Cf. Barnes v. PCH Parker, 464 So.2d 1298, 1299 (Fla. 1st DCA 1985). ("Worker's Compensation Act  in its day-to-day operation is intended to be  beyond all else  quintessentially an employer-carrier monitored system, rather than a claimant-attorney monitored system.")
Moreover, even if the e/sa had complied with its responsibilities by informing the claimant of the requirement to perform a job search, in the absence of evidence that the claimant has voluntarily limited his income, a claimant, by finding and holding a job, is considered to have performed the equivalent of a work search. Stahl v. Southeastern X-Ray, 447 So.2d 399, 401 n. 4 (Fla. 1st DCA 1984). Accordingly, once the claimant accepted employment, he fulfilled the requirement of a work search and was entitled to WL resulting from any diminution between his pre-injury and post-injury average weekly wage.
The deputy additionally found that the claimant had failed to secure employment commensurate with his abilities, observing that the claimant, although trained as a tailor, had not sought such employment, and had also dropped out of a rehabilitation program. Nothing in the record, however, supports a finding that the claimant could have earned more money as a tailor than he had as a busboy, or that employment as a tailor was available to him. Moreover, the record discloses that the reason the claimant left his rehabilitation program was that he was unable, because *142 of his asthmatic condition  the rehabilitation environment made it extremely difficult for him to breathe  to complete a training program in welding.
We conclude that the claimant is entitled to WL benefits, as of the date the e/sa terminated payment of TTD payments.
The dc in his order determined MMI to be on or about May 15, 1984. The date the parties stipulated to be the date of the accident was October 1, 1984. The latter date was also the date the dc found claimant to have been last exposed to flour dust. In that the date of MMI cannot occur prior to the date of an accident, we reverse the date of MMI and remand the matter to the dc for a new determination of the date of MMI.
REVERSED and REMANDED for further proceedings.
SHIVERS and ZEHMER, JJ., concur.
NOTES
[1] An asthmatic is rated as severely impaired under the AMA Guidelines if a person, despite optimum medical therapy, has had six or more attacks yearly, requiring emergency room or hospital care. AMA Guidelines at 86, 98. While the claimant was found to have asthma, his condition was regarded as controllable if he stayed away from aerosol flour.
[2] Dr. Klimas explained the finding of ten percent impairment as follows:

[T]he reason why I ranked him at about ten percent is because he requires chronic medications, that off those medications he could progress to have chronic lung changes like emphysema, and because it is quite reasonable to expect that he's going to have periods of abnormal lung functions, possibly as frequently as once a month, that could, if not treated quickly and reversed quickly, go on to cause chronic lung changes.