PER CURIAM.
In this worker’s compensation appeal, claimant Peggy Coplin appeals the order of the Judge of Compensation Claims (JCC) denying her claim for further medical goods and services and denying her claim for wage loss benefits from December 1, 1988 through August 14, 1989. We affirm in part, reverse in part and remand.
Claimant raises three issues on appeal: (1) whether the JCC erred in denying wage loss benefits due to the untimely filing of the *1283 claim; (2) whether the JCC erred in determining that claimant was not entitled to wage loss benefits because claimant was not assigned a permanent impairment rating in accordance with the American Medical Association (AMA) Guides; (3) whether the JCC erred in denying authorization for medical goods and water therapy on the ground that claimant had attained maximum medical improvement without permanent impairment. Having carefully considered each of the issues we find no merit to appellant’s arguments with respect to the second and third issues and affirm the JCC’s order as it pertains to these issues. The first issue, however, merits discussion.
While working for appellee Department of Health and Rehabilitative Services (HRS), claimant sustained two industrial accidents on a rainy day, July 7, 1988. While exiting the building claimant descended three or four steps and slipped, falling on her hands and knees. Claimant went back into the building and advised a secretary that she had fallen. Upon exiting the building a second time, claimant again fell on the same steps. Claimant fell on her posterior with her left leg bent back and her right leg extended forward. Claimant was off of work for two or three weeks because of these falls. Claimant received workers’ compensation benefits during these two or three weeks and was treated by Dr. Sullivan, an orthopedic surgeon. Claimant returned to work for about a week and a half, during which time her knees were still swollen and she experienced pain and limping. After the week and a half of work, claimant left work again to have back surgery related to a prior automobile accident.
In August 1988, claimant left for New Jersey to have back surgery. Claimant received post surgery treatment from Dr. Sullivan who did not allow claimant to return to work until December 1988. Claimant worked only one day and found that she could not perform her job. Claimant felt forced to resign at that time. Claimant’s supervisor testified that claimant stated that she resigned because she could not perform her job duties after coming back from surgery. The supervisor further stated that claimant never mentioned, either orally or in her letter of resignation, that her resignation was in any way related to her knee injury. Claimant, herself, admitted that she could not work between August and December 1988, because of her back condition.
Claimant tried working as a substitute teacher but found that she could not do that either. Claimant searched for work to no avail. Claimant then sought vocational rehabilitation assistance at a community college. Claimant found work with the Census Bureau from May 1989 through June 1989. This position, too, was difficult for claimant who had difficulty getting in and out of cars. Because of this difficulty, claimant called the adjuster in her worker’s compensation claim seeking further medical attention, since Dr. Sullivan was leaving town. The adjuster authorized Dr. Davidson, an orthopedic surgeon, but made no mention of wage loss and temporary partial benefits.
Claimant testified that her back improved dramatically after surgery, but her knees are even more painful since she stopped taking medication for her back. Dr. Sullivan treated claimant for her knee problems and Dr. Davidson prescribed physical therapy. Claimant testified that her left kneecap moves, pops and swells, that she sometimes has to walk stairs sideways, and that she limps. Claimant said her low back is affected by her awkward gait, and that her knee exercises also cause flare-ups in her low back.
After treating with Dr. Sullivan and Dr. Davidson, claimant realized that she needed more education in order to improve her job opportunities. Claimant advised the adjuster that she would be attending Temple University in Philadelphia and needed to see a doctor in that area. The e/c authorized Dr. Kain. The adjuster did not inform claimant of the need to file temporary partial or wage loss forms until February 1990.
Dr. Davidson saw claimant on three occasions between 6/21/89 and 8/15/89. Dr. Davidson diagnosed patellar femoral syndrome although a diagnosis of chondromala-cia would also be consistent with claimant’s symptoms. The difference between the two diagnoses is that chondromalacia implies ac *1284 tual damage to the sliding surface of the kneecap, whereas patellar femoral syndrome does not. An accurate diagnosis, however, can be determined only by operating on the patient. Dr. Davidson detected crepitus[1] in each kneecap on the second visit, but felt this was not abnormal. Davidson also noted a degree of “catching” of the kneecap, attributable either to “maltracking” or roughness in the back of the kneecap. Dr. Davidson opined that claimant had reached MMI without any permanent impairment pursuant to the AMA Guides on August 15, 1989.
Dr. Kain first saw claimant in October 1989. He diagnosed chondromalacia of the left patella. Kain thought claimant had a problem with the articular surface of the patella or the anterior surface of the distal femur. This opinion was based on Kain’s observation of crepitus and other symptoms. Kain also noted atrophy of the quadriceps which he felt was attributable to the chondro-malacia (claimant favoring one leg over the other). Dr. Kain prescribed various modes of exercise, including stationary bicycle, water therapy and light weight lifting. Dr. Kain also opined that claimant’s condition could degenerate into traumatic arthritis in the knees.
Dr. Kain examined claimant just prior to his deposition of July 10, 1990. He again diagnosed crepitus. Pressing the kneecap against the femur bone also caused pain. Dr. Kain felt claimant had attained MMI, but recommended water therapy, stationary bicycle and quadriceps weight training. Kain opined that claimant did have a permanent impairment, particularly of the left knee, but could not state what the percentage of impairment might be because such ratings are not emphasized under Pennsylvania’s workers’ compensation law.
As to the claim for wage loss benefits from December 1, 1988 through August 14, 1989, the JCC found that claimant resigned from her employment because of her unrelated back problem, and the e/c was therefore not placed on notice of a claim or need for further wage loss information until a claim was filed in November 1989. The JCC found that claimant’s wage loss request forms were not timely filed and denied the claim on that basis.
The question whether the e/c was relieved of its duty to inform claimant of her job search obligations due to the circumstances surrounding her resignation is a close one. The e/c was well aware that claimant was being treated by Dr. Sullivan for her com-pensable knee injury. Nonetheless, the e/c justifiably believed that claimant’s resignation was due to her unrelated back injury. When claimant returned to Florida from her back surgery in New Jersey, claimant received follow up treatment by Dr. Sullivan for her back condition. Thus, while Dr. Sullivan was treating claimant for her noncom-pensable back injury he was apparently still authorized to treat her compensable knee condition. Claimant, herself, testified that she was undergoing physical therapy for both her knee and her back during this period. When claimant contacted the e/c in June of 1989 to request.authorization of Dr. Davidson (because Dr. Sullivan was leaving town), the e/c knew or should have known that claimant required further treatment for her compensable knee injury. During this entire period, the e/c reasonably should have inquired as to the status of claimant’s overall condition to ascertain whether claimant’s compensable knee injury was a contributing cause of claimant’s unemployability or wage loss. Again, when claimant moved to Pennsylvania to attend school, the e/c authorized Dr. Kain to treat claimant’s knee. The e/c should have been aware of Dr. Kain’s reports of claimant’s knee condition, and inquired as to whether claimant’s compensable knee injury was a contributing cause of claimant’s unemployability or wage loss.
In the present case, the record contains competent, substantial evidence to support the JCC’s findings that: (1) the e/c was informed that claimant resigned from her position because of problems with her unrelated back injury; (2) claimant requested authorization of Dr. Davidson because Dr. *1285 Sullivan was leaving town, but did not mention an inability to work because of her knees. However, the following findings of the JCC are not supported by competent, substantial evidence: (1) “No allegation of continued knee problems was made until claim was filed on November 20, 1989”; (2) “The e/c neither knew nor should have known that the claimant was contending that she had a continuing problem with her knees.” In fact, the e/c authorized Dr. Sullivan, Dr. Davidson and Dr. Kain to treat claimant’s knee injury prior to November 20, 1989. Therefore, if the e/e had monitored claimant’s condition they would have been able to determine the extent to which claimant’s knee injury contributed to her unem-ployability and wage loss.
Where the e/c is providing ongoing treatment for a compensable injury, the e/c has the duty to inform the claimant of her job search obligations even if the e/c believes that further employment is precluded by a noncompensable condition. This is so .because a subsequent improvement in the non-compensable condition may then make the claimant eligible for wage loss benefits. In this respect, the present case is distinguishable from Certified Grocers v. Conerty, 529 So.2d 1201 (Fla. 1st DCA 1988), where it appears that claimant was not receiving treatment for his compensable injury during the period between his resignation and the filing of the claim for wage loss and medical benefits. In Certified Grocers v. Conerty, claimant suffered a compensable knee injury in 1981. Claimant was treated and attained MMI, returning to work with a 12% permanent impairment. In 1985, claimant again injured the same knee while employed with the same employer. Later in 1985, claimant resigned from his employment in order to run his own business. After closing his business, claimant did not find work until November of 1986. Claimant then sought wage loss benefits dating back to August of 1985, submitting wage loss forms and job search lists. Claimant explained the delay in submission of the forms by arguing that the employer had not provided the appropriate wage loss information when he resigned from his job in 1985. The deputy commissioner agreed with the claimant’s position. On appeal, however, this court found that the events surrounding claimant’s resignation did not place the employer on notice of the need to supply wage loss information upon claimant’s resignation. But when claimant inquired as to his entitlement to wage loss benefits in August of 1986 and sought further medical benefits for his injured knee, the obligation to supply wage loss information to claimant was held to be imputed to the employer from that point forward. Accordingly, claimant’s untimeliness in filing the wage loss forms was not excused prior to August 1986.
In the present case, the e/c at the very least should have known of the continuing treatment required for claimant’s knee and should have known that claimant’s compensa-ble knee condition may have been a contributing cause of wage loss. Therefore, the e/e was obligated to inform claimant of her job search responsibilities for the period December 1, 1988 through August 14, 1989. Because the e/c failed to so inform claimant, claimant is excused from the job search requirement.
Finding claimant excused from the job search requirement, however, does not automatically entitle claimant to wage loss benefits. “The legal effect of a failure to so inform is to relieve the claimant of the necessity of performing the work search, but this does not conclusively entitle the claimant to benefits.” Nickolls v. University of Florida, 606 So.2d 410, 413 (Fla. 1st DCA 1992) (citing Burger King v. Nicholas, 580 So.2d 656 (Fla. 1st DCA 1991); Coq v. Fuchs Baking Co., 507 So.2d 138 (Fla. 1st DCA 1987)).
[T]he mere excusal of the work search requirement is not sufficient to establish the causal relationship between the change in employment status and the compensable injury. In asserting a claim for benefits, the initial burden is on the claimant to demonstrate an entitlement to benefits upon a change in employment status due to a compensable injury. § 440.15(3)(b)2, Fla.Stat.; Edwards v. Caulfield, 560 So.2d 364 (Fla. 1st DCA 1990). Depending upon the circumstances, this burden may be satisfied by proof which encompasses medical evidence or evidence of a good faith work *1286 search. Meek v. Layne-Western Co., 566 So.2d 31 (Fla. 1st DCA 1990). Once the claimant has satisfied the initial burden, the burden of proof shifts to the employer/carrier to demonstrate a voluntary limitation of income or to demonstrate that the injury is not creating an impairment or work related physical restriction which would limit the claimant’s ability to perform appropriate employment. § 440.-15(3)(b), Fla.Stat. As was recently stated:
While there are many instances in which a claimant has been excused from any work search obligation and compensation has been awarded after an employer/carrier failed to inform the claimant of a work search responsibility, such an award is appropriate only if the circumstances (which should be considered as if an adequate work search had been performed) are sufficient to satisfy the claimant’s burden of proof. Excusing a claimant from the work search responsibility does not absolutely discharge this initial burden, and does not permit a compensation award unless the circumstances demonstrate the necessary causal relation and change in employment status. Nickolls v. University of Florida, 606 So.2d 410 (Fla. 1st DCA 1992) (Allen, J., concurring).
Publix Supermarket, Inc. v. Hart, 609 So.2d 1342, 1344-1345 (Fla. 1st DCA 1992).
In the present ease, claimant is excused from the work search requirement, but must still be held to the burden of demonstrating the causal relationship between her knee injury and wage loss, i.e., prove that her back injury did not preclude all employment during the relevant time period.[2] The JCC did not reach this question because she barred claimant’s wage loss claim on the ground of untimeliness. Even assuming an adequate work search, the establishment of the causal relationship between claimant’s wage loss and her compensable injury is a determination that should be made by the JCC, and the case must be remanded for that purpose.
AFFIRMED in part, REVERSED in part and remanded for further consistent proceedings.
MINER, WEBSTER and MICKLE, JJ., concur.

. Crepitus is a grating sensation caused by the rubbing together of the dry synovial surfaces of joints.

. More specifically:
Whether a claimant has shown a causal relationship between the injury and a change in employment status is a factual question to be determined by the deputy commissioner from competent, substantial evidence. The presence or absence of any particular fact, such as a layoff due to economic conditions, should not be legally determinative of the deputy commissioner's finding. Rather, the deputy commissioner must look to the totality of the circumstances to determine whether a claimant has shown a causal relationship between the injury and the wage loss.
Williams Roofing, Inc. v. Moore, 447 So.2d 968, 972 (Fla. 1st DCA 1984).